**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

ROBERT JAMIESON, JUDITH JAMIESON,
ROBERT JAMIESON AS TRUSTEE FOR THE
RAYMOND DAVID JAMIESON IRREVOCABLE
GRANDCHILDREN'S TRUST, and JUDITH
JAMIESON AS TRUSTEE FOR THE JAMIESON
FAMILY FOUNDATION,

                               Plaintiffs,

    -against-

SECURITIES AMERICA, INC.,
SECURITIES AMERICA ADVISORS, INC.,
HECTOR A. MAY, VANIA MAY BELL, and
EXECUTIVE COMPENSATION PLANNERS, INC.,

                             Defendants.

Case No. 19 Civ. <u>**1817**</u>

**COMPLAINT**

<u>**JURY TRIAL DEMANDED**</u>

       Plaintiffs Robert Jamieson, Judith Jamieson, Robert Jamieson as Trustee for the

Raymond David Jamieson Irrevocable Grandchildren's Trust, and Judith Jamieson as Trustee for

The Jamieson Family Foundation (collectively, "the Jamieson Family"), by their undersigned

counsel, as and for their complaint against Defendants Securities America Inc., Securities

America Advisors, Inc., (together "Securities America"), Hector A. May, Vania May Bell, and

Executive Compensation Planners, Inc. ("ECP" and collectively, "Defendants"), allege as

follows:

<u>**INTRODUCTION**</u>

      1.    This action arises from the intentional misrepresentations, theft, and breaches of

duty by Defendants – financial advisors in whom the Jamieson Family placed their complete

faith and trust – that caused the Jamieson Family to lose in excess of $18 million.

2.     Beginning in 2001, defendants Hector A. May ("May") and Vania May Bell ("Bell") embarked on a scheme to deceive and defraud the Jamieson Family in connection with securities accounts maintained by the Jamieson Family at Securities America.  Over the next 17 years, May, with the assistance of Bell, stole millions from the Jamieson Family and repeatedly provided investment advice designed to make it easier for him to steal more.

3.     The only reason May and Bell were able to perpetrate a fraud that was breathtaking in both scope (the Jamieson Family was not the only victim) and duration was the abject failure of Securities America to perform its duties. As both a broker-dealer and investment adviser registered with the Securities and Exchange Commission, Securities America was obligated to supervise May's securities brokerage and investment advisory activities as well as his outside business activities. Not only did Securities America fail to invest the time and money necessary to properly supervise May, but Securities America ignored stark red flags that were identified by its own compliance department and would have exposed the scheme in 2003, at a time when May and Bell had "only" stolen $750,000 from the Jamieson Family.

4.     During the approximately 17 years that Securities America intentionally or recklessly and continuously ignored its regulatory obligations, upon information and belief, Securities America reaped over $1 million in fees from May's brokerage and investment advisory clients, including over $500,000 from the Jamieson Family.

5.     If Securities America had performed its duties, the Jamieson Family would still have its life savings and would not have experienced the financial devastation and emotional trauma caused by learning in March 2018 that, while pretending to be a trusted family confidante, May had secretly emptied the Jamieson Family's brokerage accounts.

6.    This lawsuit is brought to hold May, Bell, and Securities America fully accountable for the losses suffered by the Jamieson Family, which are estimated to exceed $18 million.

7.    In addition to compensatory damages, the willful or willfully blind misconduct of all Defendants justifies a substantial award of punitive damages.  It is only through a substantial award of punitive damages that Securities America – a documented failure-to-supervise recidivist – will be sufficiently motivated to redesign its compliance systems, invest the resources necessary to supervise its registered investment advisor representatives in an effective way, and protect its customers against a recurrence of the type of fraud perpetrated by May and Bell. Anything less will only encourage Securities America to, once again, cynically treat lawsuits by customers such as the Jamieson Family as the "cost of doing business" and leave the investing public vulnerable to the same type of financial devastation experienced by the Jamieson Family.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332 because there is complete diversity between Plaintiffs and Defendants.

9.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. 1331 because this case involves a federal question.

10.    Venue is proper in this Court because May, Bell and ECP engaged in the underlying conduct in Rockland County, New York.

## THE PARTIES

11.     Plaintiff Robert Jamieson is a citizen of the United States and a resident of Connecticut.  He also serves as the trustee for the Raymond David Jamieson Irrevocable Grandchildren's Trust.

12.     Plaintiff Judith Jamieson is a citizen of the United States and a resident of Connecticut.  She also serves as the trustee for the Jamieson Family Foundation.

13.     Defendant Securities America, Inc. is a corporation organized under the laws of Delaware with its home office located in La Vista, Nebraska.  Securities America, Inc. is also registered with the Securities and Exchange Commission as a broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA").

14.     Defendant Securities America Advisors, Inc. is a corporation organized under the laws of Nebraska with its principal place of business in La Vista, Nebraska.  Securities America Advisors, Inc. is registered with the Securities and Exchange Commission as an investment adviser.

15.     Defendant Hector May is a citizen of the United States and a resident of the State of New York.

16.     Defendant Vania May Bell is a citizen of the United States and a resident of the State of New Jersey.

17.     Defendant Executive Compensation Planners, Inc. is a corporation organized under the laws of New York with its principal place of business in New City, New York.

4

## FACTS

### A.      The Jamieson Family

18.      Plaintiff Robert Jamieson was born in Paterson, New Jersey in 1945. He received a B.A. from Babson College in 1968, becoming the first in his family to graduate from college.

19.      Robert Jamieson was determined to become part of the music industry and, rather than pursuing other opportunities available to college graduates in the late-1960s, Mr. Jamieson took a warehouse job in Queens, New York, where he counted LP records on a production line. He then successfully applied for a position in CBS Records' management training program.

20.      Plaintiff Judith Jamieson was born in 1949 and grew up in Detroit, Michigan.  Her father died when she was three years old, and she was raised by her mother, who worked at the Student Union of Mercy Catholic College.  Judith graduated from Immaculata Catholic High School, attended secretarial school, and worked as a secretary for General Motors for two years before meeting Robert Jamieson.

21.      Judith and Robert Jamieson married in 1970.

22.      From 1970 to the mid-1990s, Robert Jamieson worked his way up the ranks of the music industry, taking executive positions at CBS Records, Polygram and BMG. To pursue those promotions, Robert and Judith Jamieson moved frequently while raising a family of three children: Cynthia, David and Byron.

23.      During his career, Mr. Jamieson was instrumental in developing and signing numerous global music industry superstars, including Bon Jovi, Dave Matthews, Christina Aguilera, N'Sync, Kings of Leon, Foo Fighters, and David Grey.

24.     In 1997, Robert Jamieson became Chairman and Chief Executive Officer of RCA Music Group. Mr. Jamieson's successful leadership at RCA was memorialized in a Harvard Business School case study.

**B.     The Jamieson Family Opens Accounts at Securities America**

25.     By 1998 the Jamieson Family had accumulated significant savings.

26.     Although Robert Jamieson had achieved success in the music industry, neither he nor Judith Jamieson had any expertise, education or training in finance or investments.

27.     The Jamieson Family decided to hire a personal financial advisor and consulted Robert Jamieson's father, Raymond Jamieson, for a recommendation.

28.     Raymond Jamieson had grown up during the Great Depression and had taught his son to be cautious about investment decisions. After working as a golf pro for 25 years at Rockland County Country Club, Raymond Jamieson had hired Hector May, a member of the country club, as his financial advisor. At May's urging, Raymond Jamieson set up a trust for the benefit of his grandchildren, Cynthia, David and Byron Jamieson – the Raymond David Jamieson Irrevocable Grandchildren's Trust U/A 12/15/98 (the "Jamieson Grandchildren's Trust").

29.     When Robert Jamieson asked his father for advice concerning the selection of a financial advisor, Raymond Jamieson recommended May.

30.     Robert Jamieson met with May and was encouraged to learn that May worked under the supervision of an established national securities firm, Securities America.

31.     The Jamieson Family hired May and, in 1999, opened its first two brokerage accounts at Securities America. On each of the account opening documents, May was listed as the Jamieson Family's registered representative at Securities America.

6

C.   **May Convinces the Jamieson Family to Place Their**
**Complete Faith and Trust in May and Securities America**

32.   During the years that followed, May used his prior relationship with Raymond Jamieson to insinuate himself into the Jamieson Family and to convince the Jamiesons to place their complete faith and trust in May and Securities America.

33.   May persuaded the Jamiesons he was acting in their best interests by pretending to act, not just as their trusted financial advisor, but as their close friend. May and his wife regularly attended social events with the Jamieson Family. For example, over the course of their 20-year relationship, May attended the weddings and college graduations of Cynthia, David and Byron Jamieson.

34.   Later in their relationship, in or about 2015, Robert Jamieson suffered a severe, hemorrhagic stroke that left him disabled and hospitalized for more than one year. May visited Robert Jamieson at the hospital and assured Judith Jamieson that she should focus all her energy and attention on Robert Jamieson's recovery because May was doing everything necessary to protect the Jamieson Family's financial interests.

35.   May also used his association with Securities America to encourage the Jamieson Family's faith in his financial advice.

36.   On numerous occasions May communicated to the Jamieson Family that he participated in regular calls with the sales and research departments of Securities America so he could provide the best possible investment advice to the Jamieson Family.

37.   May also explained to the Jamieson Family that Securities America conducted periodic inspections of May's office in Rockland County, New York as just one part of Securities America's supervision of May's work for the Jamieson Family.

7

38.     May convinced Robert and Judith Jamieson they could rely on the integrity of May and Securities America to protect the Jamieson Family's life savings.

39.     This would prove to be a devastating lie.

**D.      Robert Jamieson Retires and Receives a Substantial Severance Payment**

40.     In or about 2004, Robert Jamieson and BMG entered into a confidential agreement pursuant to which Robert Jamieson's employment as Chief Executive Officer of BMG North America terminated. In connection with the agreement, Robert Jamieson received a substantial payment (the "Settlement Funds").

41.     At the time that Robert Jamieson left BMG, it was uncertain whether, at age 59, Robert Jamieson would be able to obtain another senior executive position in the music industry. As a result, the Jamieson Family understood and communicated to May and Securities America that the Settlement Funds, together with their existing savings at Securities America, might serve as the principal source of income for Robert and Judith Jamieson for the rest of their lives.

42.     Faced with the critical decision concerning how to invest the Settlement Funds, the Jamieson Family sought and obtained advice from May and Securities America. In these communications, May instructed the Jamiesons to prepare a monthly budget that would include all possible expenses, including education expenses for their children.

43.     At that point in time, the Jamieson Family owned a large home in Connecticut and a two-bedroom apartment in New York, both of which gave rise to substantial maintenance and real estate tax expenses. In addition, two of their three children had not yet completed their college and graduate school education.

44.     Following May's instructions and wanting to make sure the Settlement Funds would be invested in a manner that protected his family's long-term financial security, Robert

Jamieson submitted to May and Securities America a budget that indicated the Jamieson Family would need monthly cash flow to cover its expenses.

45.     The Jamieson Family then deposited the entirety of the Settlement Funds into brokerage accounts at Securities America.

46.     Rather than investing the Settlement Funds into a diversified portfolio tailored to meet the financial needs of the Jamieson Family, the Defendants managed the Jamieson Family's assets in a way that was designed primarily to advance May's fraudulent scheme.

E.     **May's Scheme to Defraud the Jamieson Family**

47.     Beginning in 2001, shortly after death of Raymond Jamieson, May and Bell devised a scheme to steal the Jamieson Family's money.

48.     May implemented this scheme in two primary ways.

49.     First, over the course of their relationship, May advised the Jamieson Family to open approximately 20 different brokerage accounts at Securities America. These included multiple individual accounts in the name of Robert Jamieson and Judith Jamieson, at least five separate joint accounts in the name of Robert and Judith Jamieson, four retirement accounts, and separate brokerage accounts for a charitable foundation called the Jamieson Family Foundation (the "Family Foundation").

50.     Upon information and belief, May opened these accounts to make it more difficult for the Jamiesons to keep track of their assets so that May and Bell could steal the Jamieson Family's money without detection by the Jamieson Family.

51.     Second, May advised the Jamieson Family to invest its assets primarily in municipal bonds. May then regularly directed Robert and Judith Jamieson to wire funds from their personal joint bank account at US Trust to an account at JP Morgan Chase entitled

"Executive Compensation Planners, Inc. Custodial Account FBO Robert and Judith Jamieson." May represented to the Jamieson Family that he needed these funds to purchase new municipal bonds for the Jamieson Family in its multiple Securities America brokerage accounts. At all times, Bell assisted May and actively participated in issuing instructions to the Jamieson Family to send monies to the "custodial" account.

52.     In truth, there was no "custodial" account.  Instead, the bank account to which May directed the wire transfers from the Jamieson Family was simply a bank account held in the name of ECP, May's own company, which he used to steal the Jamieson Family's money.

53.     Bell, in her role as controller of ECP, managed the ECP bank accounts, oversaw the deposits into the "custodial" account, transferred funds from the "custodial" account to ECP's main operating account, and recorded transactions into a bookkeeping program. In that bookkeeping program, Bell falsely described the funds stolen from the Jamieson Family as "loans payable" when Bell knew that the Jamieson Family had made no such loans to May, Bell or ECP.

54.     From 1998 through 2015, based on May's advice, the Jamieson Family deposited more than $15 million into the approximately 20 different brokerage accounts set up by May for the Jamieson Family at Securities America.

55.     To cover up his thefts of these funds, May and Bell regularly prepared and sent false account statements to the Jamieson Family that overstated the account balances at Securities America.

**F.      May Provided Investment Advice Designed
          to Cover Up His Fraud and Increase His Fees**

56.     In addition to having its funds stolen, the Jamieson Family suffered damages from May's investment advice, which was designed, not to grow the Jamieson Family's wealth or to

10

generate income, but to cover up his fraudulent scheme and maximize May's – and Securities
America's – fees.

57.     As discussed above, May advised the Jamieson Family to focus its investment
strategy on municipal bonds. Upon information and belief, this strategy allowed May to falsely
claim on a regularly basis that bonds were maturing and to direct the Jamieson Family to transfer
funds to a "custodial" account to purchase new bonds. In reality, the transfers were made to
May's own ECP account and were used for May's personal use rather than to purchase bonds.

58.     In addition, May encouraged the Jamieson Family to make high-risk investments
outside of Securities America, including investments in a startup "music cruise" business and a
real estate investment venture in New Canaan, Connecticut. May himself handled the accounting
for the New Canaan venture and exaggerated its losses in communications to the Jamieson
Family. May then attributed the reduced principal balances of the accounts at Securities
America, which were reported by May to the Jamieson Family, to losses suffered from these
high-risk investments rather than to May's theft.

59.     May also repeatedly advised the Jamieson Family against selling any securities or
taking any assets out of the Jamieson Family's brokerage accounts after May had begun stealing
funds from those accounts. From 2016 to 2017, May advised Judith Jamieson to borrow against a
home equity line of credit to pay living expenses rather than sell any securities in the Jamieson
Family accounts at Securities America. By early 2018, the loan balance on the home equity line
of credit had grown to approximately $350,000. In February 2018, May advised Judith Jamieson
via email "DO NOTHING SELL NOTHING MOVE NOTHING.  Selling and getting out of the
market is not the thing to do."

60.     Upon information and belief, May advised the Jamieson Family against selling securities in order to prevent the Jamiesons from learning that the value of their brokerage accounts at Securities America, by the end of 2017, had dropped to approximately $50,000.

61.     Finally, May advised the Jamieson Family to purchase unsuitable financial products that, upon information and belief, allowed May and Securities America to collect high commissions and made it easier for May to liquidate the products to steal the Jamieson Family's money.

62.     For example, in 2005, May caused the Jamieson Family to invest $2.3 million in long-term annuities issued by Allianz Life Insurance Company (the "Allianz Annuities"). Upon information and belief, the Allianz Annuities generated substantial commissions for May and Securities America and were not designed to meet the financial goals of the Jamieson Family.

63.     Worse yet, beginning in May 2007, May caused the Jamieson Family to surrender the Allianz Annuities, thereby depriving the Jamieson Family of the potential income stream from the annuity products and forcing the Jamieson Family to suffer more than $100,000 in unnecessary penalties and losses. Upon information and belief, May caused the Jamieson Family to surrender the Allianz Annuities so he could steal the proceeds through the fraudulent municipal bond scheme described above.

G.     **Securities America's Obligations to the Jamieson Family**

64.     On its public website, Securities America represents that it understands that financial advisors "cannot do it alone" and that Securities America "provide[s] tools needed to offer the highest quality guidance and advice" to clients. Furthermore, Securities America claims that it "remain[s] focused on helping advisors create a more effective, profitable and satisfying practice by providing exceptional financial counsel, product offerings, and service" to clients.

According to Securities America, the relationship between Securities America and representatives such as May can be described as follows: "By your side. That's where we'll be every step of the way."

65.     In or about November 2010, the Jamieson Family executed an agreement with Securities America, May and ECP.

66.     The agreement governs the terms of the Jamieson Family's investments with Securities America and, upon information and belief, replaced similar agreements the Jamieson Family had executed in the past.

67.     In that November 2010 agreement, although Securities America attempts to disclaim any losses resulting from "risks inherent in all financial decisions and transactions," Securities America acknowledges it may be subject to liability for any loss that "directly results . . . from negligence or malfeasance" of Securities America or "its representatives, agents or affiliates."

68.     Securities America further acknowledges that nothing in the agreement is intended to waive any right of action the Jamieson Family may have in the event Securities America "breaches any fiduciary duty owed to" the Jamieson Family.

**H.     The Direct Responsibility of Securities America for the Success of May's Scheme**

69.     Over the course of the Jamieson Family's 20-year relationship with May and Securities America, Securities America benefitted from May's fraudulent scheme and repeatedly acted – and failed to act – in ways that helped May perpetrate the scheme.

70.     Most outrageously, on May 5, 2003, a representative of Securities America's compliance department ("SA Compliance") sent an email to May to express concern about (a) three large withdrawals, totaling $350,000, from a brokerage account of the Jamieson Family

13

that occurred between January and April 2003, and (b) the sale of a mutual fund that created a deferred sales charge of nearly $4,000 because the fund had been held for a short period.

71.     In the email, SA Compliance stated: "As a member of your Regional Supervision Team, my responsibilities include reviewing the activity in your clients' accounts."  SA Compliance sent the email to hectormay@usa.net, a non-Securities America email address used by May to conduct his securities and investment advisory businesses (the "USA.Net Email Address").

72.     In a letter dated May 14, 2003, May claimed the withdrawals "were for personal reasons" and assured SA Compliance that the funds "have not gone to another broker/dealer." May also claimed that the Jamieson Family was "not happy with MFS Limited Maturity Class B" and was "well aware of the deferred sales charges."  The May 14 letter sent by May noted that, at that time, he was both a registered representative and a registered principal of Securities America.

73.     Contrary to May's representations to SA Compliance, neither Robert nor Judith Jamieson had expressed (or could have expressed) an informed opinion concerning the investment quality of the MFS Limited Maturity Class B mutual fund, a short-term, conservative bond fund.

74.     In fact, the $350,000 in withdrawals identified by SA Compliance in May 2003 represented thefts by May from the Jamieson Family brokerage accounts via the fraudulent municipal bond scheme described above.

75.     Upon information and belief, SA Compliance did not make any further inquiries concerning either the $350,000 in withdrawals or the self-serving sale of the MFS Limited

Maturity Class B fund, which caused the Jamieson Family to incur unnecessary additional sales charges for May and Securities America's financial benefit.

76.     Upon information and belief, SA Compliance made no attempt to communicate directly with the Jamieson Family concerning the early 2003 withdrawals or the sale of the mutual fund.

77.     Had SA Compliance taken any additional steps to investigate the false representations in May's letter, the Jamieson Family would have avoided the financial devastation they subsequently suffered.

78.     From 2004 through at least 2015, Securities America failed to investigate many other "red flags." For example, in 2005, May sold an annuity issued by Integrity Life Insurance Company that had a value as of December 31, 2004 of $394,086 held by the Grandchildren's Trust and purchased an annuity issued by Allianz Life Insurance Company, which then had a value as of December 31, 2005 of $381,108.

79.     Upon information and belief, the sole purpose of this senseless switch from one annuity provider to another was to generate commission income for May and Securities America. Upon information and belief, SA Compliance failed to investigate this improper transaction and failed to discuss it with the Jamieson Family to ensure it was authorized.

80.     From 2004 through at least 2015, SA Compliance also failed to monitor communications between May and the Jamieson Family. For example, May used the USA.net Email Account – the same account SA Compliance used to communicate with May – to instruct the Jamieson Family to wire funds to the non-existent "custodial" account.

81.     Upon information and belief, SA Compliance conducted periodic inspections of the branch office where May served as both principal and registered representative of Securities

15

America. Had SA Compliance conducted these inspections in a reasonably competent manner, it would have discovered the false account statements May prepared and sent to the Jamieson Family.

82.     Securities America itself also regularly sent the Jamieson Family correspondence that falsely indicated the Jamieson Family continued to hold as much as $25 million in the Jamieson Family's brokerage accounts at Securities America. For example, in September 2017, Securities America sent a letter to the Jamieson Family enclosing the "information we have on file." The enclosure indicated that the Jamieson Family had "$25,000,000.00" in assets, excluding the Jamiesons' home, and that none of these assets were "held away" from Securities America.

83.     Even worse, in November 2018 – more than nine months after Securities America had fired May and after May's scheme had finally been exposed as a direct result of actions taken by the Jamieson Family – Securities America sent another letter to the Jamieson Family to confirm certain financial information. According to that letter, the books and records of Securities America showed that one of the Jamieson Family's accounts had $10 million in assets and annual income of $750,000.

84.     Securities America knew or was reckless in not knowing that this information was false.

85.     Upon information and belief, May obtained millions in fees and stolen funds from the Jamieson Family.

86.     Upon information and belief, Securities America collected over $500,000 in fees from the Jamieson Family.

87.     When the Jamieson Family acted on May's advice to purchase expensive insurance products and invest in high-risk ventures, like the "music cruise" or the Connecticut real estate venture, the Jamieson Family reasonably relied on the false representations May and Securities America made concerning the value of the holdings in their brokerage accounts.

88.     If Securities America had communicated only accurate information concerning the Jamieson Family's holdings or if Securities America had performed its supervisory activities in a minimally competent manner and acted upon any of the multiple "red flags," May would have been stopped in his tracks no later than May 2003, and the Jamieson Family – and numerous other customers of Securities America – would still have their life savings.

**I.     The Discovery of May's Scheme**

89.     In the fall of 2017, Judith Jamieson began discussing with May the possibility of moving her family's accounts from Securities America to another brokerage firm. Judith Jamieson told May, naively, that while she appreciated everything May had done for the Jamieson Family, she was concerned that May was likely to retire soon.

90.     May, who had stolen millions from the Jamieson Family and had been sending false account statements, dissuaded Judith Jamieson from taking any action for several months.

91.     At the end of February 2018, Judith Jamieson decided to disregard May's pleas and arranged for another brokerage firm to initiate a transfer of the Securities America accounts.

92.     Upon completing the process, the new brokerage firm informed Judith Jamieson that the accounts held little to no assets.

93.     Judith Jamieson attempted to contact May, naively assuming that an administrative error had occurred.

94.     May informed Judith Jamieson that he could not provide any information to her. When she asked why, May referred Judith Jamieson to his criminal defense attorney.

95.     It was only then that the Jamieson Family discovered that May had stolen millions of dollars from the Jamieson Family and drained the Securities America accounts.

96.     This revelation has caused both financial and emotional devastation. All the members of the Jamieson Family – Robert, Judith, Cynthia, David and Byron – have attempted and failed to make sense of the fact that they were victims of a 17-year scam perpetrated by a trusted family friend and enabled by an established national financial firm.

97.     In the immediate aftermath of this discovery, the Jamieson Family sold certain items, including furniture, and borrowed additional monies from its home equity line of credit to meet the Jamieson Family's financial obligations.

98.     Robert and Judith Jamieson have since sold their home in Connecticut and their apartment in New York to raise new funds and reduce their living expenses.

99.     At a time in their lives when they hoped to enjoy the fruits of their hard work and to continue to work on Robert Jamieson's recovery from his stroke, Robert and Judith Jamieson are, instead, figuring out how to restructure their lives to make ends meet.

100.    The Jamieson Family also continues to search for answers to the fundamental "why" questions raised by the events described in this complaint: why did May betray the Jamieson Family for so much money; why did Securities America enable May for so long; why didn't Securities America detect the scheme; and why didn't Securities America alert the Jamieson Family in response to the many red flags.

101.    The Jamieson Family brings this action both to recover its financial losses and to seek answers to these questions.

18

## FIRST CLAIM FOR RELIEF:

## SECURITIES FRAUD

**(Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder, 15 U.S.C. §78j(b))**
**(Against All Defendants)**

102.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 101 as if fully set forth herein.

103.     May, Bell and ECP made material misrepresentations and omitted material facts in connection with purchases and sales of securities by the Jamieson Family.

104.     For example, May made the following false statements:

a.     In an email dated July 15, 2014, May falsely told Robert Jamieson he intended to renew a $75,000 bond at a "higher rate" and directed the Jamieson Family to wire $25,000 to the "ECP Custodial Account FBO Robert & Judy Jamieson."  May had no intention of renewing any bond, and the bank account that received the wire was not set up for the benefit of the Jamieson Family.  Upon information and belief, May stole the wired funds.

b.     On or about August 27, 2014, May directed the Jamieson Family to wire $1.2 million to a brokerage account at Securities America for the false purpose of purchasing securities.  May concealed the fact that he intended to and did, in fact, steal these funds.

c.     In an email dated November 12, 2014, May falsely told Robert Jamieson he needed $50,000 to renew a bond and directed the Jamieson Family to wire $50,000 to the false "ECP Custodial Account FBO Robert & Judy Jamieson."  Upon information and belief, May stole these funds.

d.      In an email dated December 11, 2014, May directed Robert Jamieson to wire $50,000 to the fake "ECP Custodial Account" for the false purpose of renewing a bond.  Upon information and belief, May stole these funds.

e.      On June 2, 2014, in response to a request from Robert Jamieson for $100,000 to pay medical bills, May falsely informed the Jamieson Family it would have to wait approximately two weeks for "several bonds" to mature.  Upon information and belief, May had stolen the Jamieson Family's funds and needed to find another source of funds to satisfy the Jamieson Family's request.

f.      On March 18, 2015, May falsely told Judith Jamieson he needed $25,000 to renew a bond at a "higher rate" and directed her to wire $25,000 to the nonexistent "ECP Custodial Account FBO Robert & Judy Jamieson."   Upon information and belief, May stole these funds.

g.      On or about June 17, 2015, May directed Judith Jamieson to transfer $250,000 from the proceeds of the sale of one of the Jamieson Family's investment properties in New Canaan, Connecticut to the false "ECP Custodial Account" for the purpose of purchasing municipal bonds.  Upon information and belief, May had no intention of using these funds to purchase bonds and instead stole the entire $250,000.

h.      On or about July 15, 2015, May falsely blamed an "internal transfer delay" for the lack of sufficient funds to cover checks issued by the Jamieson Family Foundation.  Upon information and belief, the true reason for the lack of funds was that May had stolen them.

105.    May knew these misrepresentations and omissions were false and intended to defraud the Jamieson Family at the time he made them.

106.     The Defendants utilized the means and instruments of communication in interstate commerce and the mails in their fraudulent communications with the Jamieson Family.

107.     Plaintiffs reasonably relied upon the misrepresentations and fraudulent omissions communicated to them by Defendants when purchasing and selling securities.

108.     May made the misrepresentations and fraudulent omissions in the course of the performance of his duties as a registered representative and registered principal of Securities America.

109.     Securities America is liable for the misrepresentations and fraudulent omissions communicated by May under the doctrine of *respondeat superior* liability.

110.     As a result of the misrepresentations and fraudulent omissions by the Defendants, Plaintiffs suffered damages in an amount to be proven at trial and estimated to exceed $18 million.

**SECOND CLAIM FOR RELIEF:**

**<u>CONTROL PERSON LIABILITY</u>**

**(15 U.S.C. §78t)**
**(Against Securities America)**

111.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 110 as if fully set forth herein.

112.     Securities America possessed and actually exercised control over the securities business of May.  In fact, Securities America was obligated by law and regulation to supervise effectively all of May's business activities.

113.     May repeatedly lied to the Jamieson Family in connection with its purchase and sale of securities.

114.    Securities America acted with gross recklessness in disregarding and failing to fulfill its duty to supervise and monitor May's activities.  Even when confronted with clear red flags, Securities America failed to investigate and detect May's broad-based, fraudulent schemes, including the scheme to defraud the Jamieson Family.

115.    By failing to comply with its legal obligations concerning the supervision of May's business activities, Securities America culpably participated in those activities.

116.    By reason of its control over May and its culpable participation in May's fraudulent schemes, Securities America is liable to the Jamieson Family for all damages suffered by the Jamieson Family pursuant to Section 20(a) of the Securities Exchange Act of 1934.

117.    The damages suffered by the Jamieson Family are estimated to exceed $18 million.

**THIRD CLAIM FOR RELIEF:**

**<u>FRAUDULENT CONCEALMENT</u>**

**(Against all Defendants)**

118.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 117 as if fully set forth herein.

119.    Defendants owed the Jamieson Family a duty to disclose material facts concerning their investments.

120.    May, Bell and ECP issued false statements that overstated the value of certain accounts held by the Jamieson Family, including the following:

a.      In or about August 2015, May and ECP issued a false statement indicating that certain joint accounts held by Robert and Judith Jamieson held approximately $5.7 million in securities.

22

b.      In or about August 2015, May and ECP issued a false statement indicating that the Grandchildren's Trust contained approximately $300,000 in securities.

c.      In or about December 2015, May and ECP issued a false statement indicating that certain joint accounts held by Robert and Judith Jamieson held approximately $6.1 million in securities.

d.      In or about December 2016, May and ECP issued a false statement indicating that certain joint accounts held by Robert and Judith Jamieson held approximately $6.4 million.

e.      In or about June 2017, May and ECP issued a false statement indicating that certain joint accounts held by Robert and Judith Jamieson held approximately $6.9 million.

f.      In or about December 2017, May and ECP issued a false statement indicating that certain joint accounts held by Robert and Judith Jamieson held approximately $8.7 million.

121.    May, Bell and ECP knew the Jamieson Family's accounts at Securities America had substantially less value than they represented to the Jamieson Family.

122.    May, Bell and ECP intentionally concealed the true value of the Securities America accounts to hide their fraudulent scheme and their theft of the Jamieson Family's life savings.

123.    Other agents of Securities America sent correspondence to the Jamieson Family that contained false information including the following correspondence:

a.      On or about September 3, 2017, the Vice President of "Rep Relations" at Securities America sent Robert Jamieson a letter indicating the "information we have on

file" reflected a net worth, "exclusive of home," of "$25,000,000.00" and that none of the assets were "held away" from Securities America.  In truth, the Jamieson Family's accounts at Securities America held substantially less than $25 million in assets.

       b.      On or about November 18, 2018, the Director of Service Operations at Securities America sent Robert Jamieson a letter indicating the "information we have on file" reflected a net worth, "exclusive of home," of "$10,000,000.00" and that none of the assets were "held away" from Securities America.  In truth, the Jamieson Family's accounts at Securities America held substantially less than $10 million in assets.

124.    Upon information and belief, these agents of Securities America knew these statements were false at the time they made them or were reckless in not knowing the true value of the accounts.

125.    The Jamieson Family reasonably relied on Defendants' false representations by making investments and other financial decisions based on the mistaken belief that they had millions more in savings than they actually had.

126.    The Jamieson Family reasonably relied on Defendants' false representations by allowing Defendants to continue to manage their investments.

127.    May fraudulently concealed the true value of the Jamieson Family's accounts at Securities America in the course of the performance of his duties as a registered representative and registered principal of Securities America.

128.    In addition to its direct liability, Securities America is liable for the misrepresentations and fraudulent omissions communicated by May under the doctrine of *respondeat superior* liability.

129.    As a result of Defendants' fraudulent concealment, Plaintiffs suffered damages in an amount to be proven at trial and estimated to exceed $18 million.

### FOURTH CLAIM FOR RELIEF:

### <u>FRAUD</u>

### (Against all Defendants)

130.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 129 as if fully set forth herein.

131.    May and ECP made material misrepresentations and omitted material facts in connection with the Jamieson Family's investments.

132.    Plaintiffs reasonably relied upon the misrepresentations and fraudulent omissions communicated to them by May and ECP when purchasing and selling securities and making other investment decisions.

133.    May made the misrepresentations and fraudulent omissions in the course of the performance of his duties as a registered representative and registered principal of Securities America.

134.    Securities America is liable for the misrepresentations and fraudulent omissions communicated by May under the doctrine of *respondeat superior* liability.

135.    As a result of the misrepresentations and fraudulent omissions by the Defendants, Plaintiffs suffered damages in an amount to be proven at trial and estimated to exceed $18 million.

## FIFTH CLAIM FOR RELIEF:

## <u>AIDING AND ABETTING FRAUD</u>

### (Against Securities America and Bell)

136.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 135 as if fully set forth herein.

137.    May and ECP made material misrepresentations and omitted material facts in connection with purchases and sales of securities by the Jamieson Family and investment advice provided to the Jamieson Family by May and ECP.

138.    Plaintiffs reasonably relied upon the misrepresentations and fraudulent omissions communicated to them by May and ECP when purchasing and selling securities and making other investment decisions.

139.    Through the many suspicious transactions and "red flags," including the unexplained withdrawal of $350,000 in 2003, Securities America had knowledge of May and ECP's fraud.

140.    By providing brokerage accounts services that enabled May to implement his fraudulent scheme, communicating false information to the Jamieson Family, and allowing May to manage the Jamieson Family's accounts without supervision, Securities America provided substantial assistance to advance the fraud's commission.

141.    Bell also had knowledge of May and ECP's fraud.  Upon information and belief, Bell knew that ECP did not maintain a "custodial" account for the benefit of the Jamieson Family and knew that funds being transferred by the Jamieson Family were not being used to purchase bonds as May claimed.

142.     Bell provided substantial assistance to advance May and ECP's scheme to defraud by, among other things, falsely characterizing funds stolen from the Jamieson Family as "loans payable" in ECP's books and facilitating the deposits of the Jamieson Family's funds into ECP's bank accounts.

143.     Securities America and Bell are liable to the Jamieson Family for aiding and abetting fraud.

144.     As a result of Securities America and Bell's aiding and abetting fraud, Plaintiffs suffered damages in an amount to be proven at trial and estimated to exceed $18 million.

**SIXTH CLAIM FOR RELIEF:**

**<u>NEGLIGENT MISREPRESENTATION</u>**

**(Against Securities America)**

145.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 as if fully set forth herein.

146.     Securities America owed the Jamieson Family a fiduciary duty, and, as a result of its superior knowledge and expertise, had a special relationship of trust with the Jamieson Family that required Securities America to provide the Jamieson Family with correct information concerning its investments. For at least part of the 17-year time period, Securities America had discretionary authority to manage the Jamieson Family's investments.

147.     Securities America, through May and other agents, made representations to the Jamieson Family that Securities America should have known were false.

148.     Securities America provided this information knowing the Jamieson Family needed it to make important investment decisions.

149.    The Jamieson Family reasonably relied on this information and acted upon it by making investments and other financial decisions based on the mistaken belief that they had millions more in savings than they actually had.

150.    The Jamieson Family reasonably relied on this information and acted upon it by allowing Defendants to continue to manage their investments.

151.    As a result of Securities America's negligent misrepresentations, Plaintiffs suffered damages in an amount to be proven at trial and estimated to exceed $18 million.

## SEVENTH CLAIM FOR RELIEF:

## BREACH OF FIDUCIARY DUTY

### (Against all Defendants)

152.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 151 as if fully set forth herein.

153.    At all relevant times, a fiduciary relationship existed between the Jamieson Family and the Defendants.

154.    Defendants owed the Jamieson Family fiduciary duties, including the duty to act in the Jamieson Family's best interests, to exercise due care, and to act in good faith in connection with their management of the Jamieson Family's investments.

155.    From 2001 through early 2018, Defendants repeatedly breached the fiduciary duties they owed to the Jamieson Family by failing to exercise due care, failing to act in good-faith, and by acting in their own interests to the detriment of the Jamieson Family.

156.    May breached his fiduciary duties in the course of the performance of his duties as a registered representative and registered principal of Securities America.

28

157.    In addition to its direct liability, Securities America is liable for May's breaches under the doctrine of *respondeat superior* liability.

158.    As a result of Defendants' fiduciary breaches, the Jamieson Family suffered damages in an amount estimated to exceed $18 million.

## EIGHTH CLAIM FOR RELIEF:

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against Securities America and Bell)

159.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 158 as if fully set forth herein.

160.    May breached the fiduciary duties he owed to the Jamieson Family.

161.    Securities America knowingly induced or participated in the breach by collecting fees and benefitting from May's scheme while failing to investigate and detect May's broad-based, fraudulent schemes, including the scheme to defraud the Jamieson Family.

162.    By failing to comply with its legal obligations concerning the supervision of May's business activities, Securities America aided and abetted May's multiple breaches of the fiduciary duties he owed to the Jamieson Family.

163.    Bell also knowingly induced or participated in May's breaches of fiduciary duty by, among other things, falsely characterizing funds stolen from the Jamieson Family as "loans payable" in ECP's books, directing the Jamieson Family to sign forms authorizing the surrender of the Allianz Annuities, and facilitating the deposits of the Jamieson Family's funds into ECP's bank accounts.

164.    As a result of Securities America and Bell's aiding and abetting May's fiduciary breaches, the Jamieson Family suffered damages in an amount estimated to exceed $18 million.

## NINTH CLAIM FOR RELIEF:

## NEGLIGENCE

### (Against all Defendants)

165.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

166.     At all relevant times, Defendants owed the Jamieson Family a duty to provide investment advice and investment advisory services in a manner that served the best interests of the Jamieson Family.

167.     At all relevant times, Defendants owed the Jamieson Family a duty to provide investment advice and investment advisory services in a manner that complied with applicable rules and regulations, including rules requiring the Defendants to ensure the Jamieson Family's investments were suitable and requiring Securities America to supervise associated financial advisors such as May.

168.     Defendants repeatedly breached their duty to provide investment advice and investment advisory services in a manner that served the best interests of the Jamieson Family and complied with applicable rules and regulations.

169.     Defendants' multiple failures to fulfill their duties to the Jamieson Family proximately caused the Jamieson Family to suffer damages in an amount estimated to exceed $18 million.

170.     The damages suffered by the Jamieson Family were foreseeable by Defendants. In particular, at the time that Securities America failed to supervise May's activities in a minimally reasonable and effective manner, Securities America either knew or should have known, based on past experience and numerous well-known examples of similar fraudulent schemes by

registered representatives of broker-dealers, that the type of damages suffered by the Jamieson Family was foreseeable.

## TENTH CLAIM FOR RELIEF:

## UNJUST ENRICHMENT

### (Against all Defendants)

171.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 170 as if fully set forth herein.

172.     Defendants benefitted from their management of the Jamieson Family's investments.

173.     May, Bell and ECP took the Jamieson Family's funds for their own use and earned fees and commissions. In total, May, Bell and ECP took millions from the Jamieson Family.

174.     Securities America earned fees and commissions from the Jamieson Family while recklessly failing to supervise May.

175.     Upon information and belief, Securities America earned over $500,000 in fees and commissions.

176.     Equity and good conscience require Defendants to provide restitution to the Jamieson Family in the amount that Defendants benefitted illegally from their wrongful conduct.

## ELEVENTH CLAIM FOR RELIEF:

## CONVERSION

### (Against all Defendants)

177.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 176 as if fully set forth herein.

178.    The Jamieson Family had a possessory right to and interest in the assets they entrusted to Defendants to be suitably invested.

179.    May, Bell and ECP, intentionally and without authority from the Jamieson Family, exercised dominion over the Jamieson Family's funds by causing the funds to be transferred into ECP's account and by using the funds for their own purposes.

180.    May, Bell and ECP failed to return the funds to the Jamieson Family and permanently interfered with the Jamieson Family's right to its life savings.

181.    May converted the Jamieson Family's assets in the course of the performance of his duties as a registered representative and registered principal of Securities America.

182.    Securities America is liable for May's conversion under the doctrine of *respondeat superior* liability.

183.    As a result of Defendants' conversion of its funds, the Jamieson Family suffered damages in an amount estimated to exceed $18 million.

## **PRAYER FOR RELIEF**

WHEREFORE, the Jamieson Family demands judgment against the Defendants as follows:

1.　　Compensatory damages in an amount to be proven at trial but not less than $18 million;

2.　　Punitive damages in an amount to be determined at trial but not less than five (5) times the amount of compensatory damages proven at trial;

3.　　An award of the costs and disbursements of this action; and

4.　　Such other and further relief as the Court may consider equitable, just, and proper.

Dated: New York, New York
　　　　February 26, 2019

SHER TREMONTE LLP

By: _____
　　　Justin M. Sher
　　　Robert Knuts
　　　Allegra Noonan
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Email: jsher@shertremonte.com

*Attorneys for the Jamieson Family*