UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ROBERT JAMIESON; JUDITH JAMIESON; :
ROBERT JAMIESON AS TRUSTEE FOR :
THE RAYMOND DAVID JAMIESON :
IRREVOCABLE GRANDCHILDREN'S :
TRUST; and JUDITH JAMIESON AS :
TRUSTEE FOR THE JAMIESON FAMILY :
FOUNDATION, :
                Plaintiffs, : **OPINION AND ORDER**
:
v. : 19 CV 1817 (VB)
:
SECURITIES AMERICA, INC.; :
SECURITIES AMERICA ADVISORS, INC.; :
HECTOR A. MAY; VANIA MAY BELL; :
and EXECUTIVE COMPENSATION :
PLANNERS, INC., :
                Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiffs Robert Jamieson, individually and as Trustee for the Raymond David Jamieson Irrevocable Grandchildren's Trust (the "Grandchildren's Trust"), and Judith Jamieson, individually and as Trustee for the Jamieson Family Foundation, bring this action against defendants Securities America, Inc. ("SAI"), Securities America Advisors, Inc. ("SAA," and together with SAI, "Securities America"), Hector A. May, Vania May Bell, and Executive Compensation Planners, Inc. ("ECP"). Plaintiffs bring federal and state law claims arising from defendants' handling of plaintiffs' Securities America brokerage accounts.

Now pending is Securities America's motion to stay the instant action and compel arbitration. (Doc. #10).

For the reasons set forth below, the motion to stay this case and compel arbitration is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**BACKGROUND**

The following factual background is drawn from the complaint and the parties' submissions in support of and in opposition to the pending motion.

I.  Plaintiffs' Securities America Brokerage Accounts

By 1998, the Jamieson family had accumulated significant savings. To manage their wealth, the Jamiesons hired Hector May, a financial advisor. At the time, May was a registered broker with Securities America and the president of ECP, a registered investment advisor and financial planning firm.

Over the years, and based on May's advice respecting supposed planning strategies, plaintiffs opened roughly twenty brokerage accounts with Securities America. The accounts comprised multiple individual and joint accounts in the names of Robert and Judith Jamieson, and separate brokerage accounts for the Jamieson Family Foundation and the Grandchildren's Trust.[1] Plaintiffs designated May as their registered representative for these accounts.

To open a brokerage account at Securities America, a customer must execute an account application containing an acknowledgement of receipt and understanding of an arbitration agreement set forth in an accompanying document.

In or about 2004, Robert Jamieson received a substantial severance payment upon the termination of his employment with BMG North America (the "settlement payment"). On May's advice, the Jamiesons deposited this settlement payment into one of their Securities America brokerage accounts.

From 1998 through 2015, plaintiffs deposited more than $15 million into their various Securities America accounts.

---

[1]  The Grandchildren's Trust was established by Raymond Jamieson, Robert Jamieson's father, who died in 2001. Robert Jamieson serves as trustee of the Grandchildren's Trust.

II.  May and Bell Deplete Plaintiffs' Accounts

According to the complaint, over the course of the parties' relationship, May and Bell, in her role as controller of ECP, devised a scheme to defraud plaintiffs and steal their money.

May frequently instructed plaintiffs to wire money to a custodial account owned and operated by May, supposedly to be used to purchase additional securities for plaintiffs. Bell, who managed ECP's accounts, oversaw plaintiffs' deposits. However, rather than purschasing additional securities for plaintiffs, May and Bell allegedly redirected the funds for their own benefit. Bell transferred the deposits from the custodial account to ECP's main operating account, and to avoid detection recorded the transactions as "loans payable." (Doc. #1 ("Compl.") ¶ 53). May and Bell also allegedly prepared and sent plaintiffs false statements overstating balances for plaintiffs' Securities America accounts.

Further, May encouraged plaintiffs to make high-risk investments that, unbeknownst to plaintiffs, May managed outside of Securities America. May then doctored records to make it appear these investments were made through plaintiffs' Securities America accounts. Specifically, May exaggerated losses from the investments and attributed reduced principal balances in plaintiffs' Securities America accounts to such losses. Moreover, May advised plaintiffs to purchase unsuitable financial products, which allowed Securities America to collect high commissions and May to siphon more easily funds from plaintiffs' accounts.

In sum, plaintiffs claim they lost about $18 million as a result of May and Bell's alleged theft and improper management of plaintiffs' Securities America brokerage accounts, and Securities America's alleged failure to properly oversee the accounts.

In August 2019, after pleading guilty to criminal charges related to his mismanagement of investors' accounts, including those of plaintiffs, May was sentenced to thirteen years in prison. Bell has been indicted and is awaiting trial.

## DISCUSSION

I. Standard of Review

"In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA") . . . , the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).[2] The party seeking to compel arbitration bears the burden of demonstrating by a preponderance the existence of an agreement to arbitrate. Progressive Cas. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 46 (2d Cir. 1993). If it fails to "make a prima facie initial showing that an agreement to arbitrate existed," the motion to compel arbitration must be denied. Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). "[W]hether the parties agreed to arbitrate is determined by state law," as arbitration agreements are considered contracts. Galeana v. Mahasan Inc., 2019 WL 3024588, at *3 (S.D.N.Y. July 11, 2019) (quoting Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002)).

"A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91–92 (2000)).

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

In deciding whether to compel arbitration, a court must determine (i) whether the parties agreed to arbitrate; (ii) if so, the scope of the agreement to arbitrate; (iii) whether Congress intended any federal statutory claims asserted to be nonarbitrable; and (iv) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration. JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004). "Only when an agreement to arbitrate is found to exist does a court proceed" any further. Spear, Leeds & Kellogg v. Cent. Life Assur. Co., 85 F.3d 21, 25 (2d Cir. 1996).

The federal policy favoring arbitration "requires [courts] to construe arbitration clauses as broadly as possible." In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011). "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, [courts] focus on the factual allegations in the complaint rather than the legal causes of action asserted." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).

The Second Circuit has provided a roadmap for determining whether particular disputes fall within the scope of an arbitration agreement. First, the court "should classify the particular clause as either broad or narrow." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d at 172. If the clause is narrow, "the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001). Notwithstanding these guidelines, courts are not required "to make the nice determination of exactly where in the range between broad and narrow [an arbitration] clause fits." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 75 (2d Cir. 1997).

When "the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d at 224. Indeed, if the arbitration clause is broad, "it is presumptively applicable to disputes involving matters going beyond the interpretation or enforcement of particular provisions of the contract which contains the arbitration clause." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d at 172.

II. Agreement to Arbitrate Claims

Securities America argues the parties agreed to arbitrate plaintiffs' instant claims. Plaintiffs disagree.

A. Meeting of the Minds

Plaintiffs argue Securities America has failed to prove the terms of any agreements to arbitrate. Specifically, plaintiffs contend Securities America cannot evidence a "meeting of the minds" concerning agreements to arbitrate because the documents on which Securities America relies are "unsigned, incomplete, and unauthenticated." (Doc. #24, at 4).

The Court is not persuaded.

The arbitration provisions at issue are governed either by Massachusetts or Nebraska law. General principles of New York contract law respecting agreements to arbitrate apply in like fashion under the laws of Massachusetts and Nebraska. Indeed, a fundamental basis for the existence of an enforceable contract is a meeting of the minds as to the essential terms and conditions of the parties' agreement. Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 372 (2d Cir. 2003); Adelson v. Hananel, 641 F. Supp. 2d 65, 83 (D. Mass. 2009); Peters v. Halligan, 152 N.W.2d 103, 106 (Neb. 1967).

Plaintiffs rely heavily on Dreyfuss v. eTelecare Global Solutions-US Inc., 2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008), aff'd sub nom. Dreyfuss v. Etelecare Global Solutions-U.S. Inc., 349 F. App'x 551 (2d Cir. 2009) (summary order), in which a court in this district declined to enforce an alleged agreement to arbitrate for lack of definiteness, because the arbitration agreement at issue was missing pages and the court was unable "to determine what in fact the parties . . . agreed to." Id. at *4.

That is not the case here. The arbitration agreements referenced in plaintiffs' new account applications are not standalone agreements, but rather provisions contained within larger "client" or "customer" agreements. (Doc. #34 at 1). The arbitration provisions are presented in full, containing all essential terms and missing no pages, even though Securities America does not provide the client or customer agreements in full. Cf. Hudson Specialty Ins. Co. v. N.J. Transit Corp., 2015 WL 3542548, at *7 (S.D.N.Y. June 5, 2015) ("The Dreyfuss court emphasized that [the arbitration agreement] involved not missing or vague terms, but missing pages. That is not the case here. The arbitration is presented in its complete form and unambiguously evinces the parties' intent to arbitrate the dispute at hand.").

For example, Robert Jamieson executed a New Account Application on December 23, 1999, which specifically incorporates a "pre-dispute arbitration agreement" in a related client agreement. (Doc. #12-1). The Grandchildren's Trust did the same on December 24, 1998. (Doc. #12-2). So too did Judith Jamieson, on March 14, 2000. (Doc. #12-3).

The pre-dispute arbitration agreement respecting these new accounts states in pertinent part:

> I agree that all controversies that may arise between us concerning any order or transactions, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened shall be determined by arbitration.

7

(Doc. #12-4 at 2).

Similarly, the Jamieson Family Foundation executed an Account Application on December 13, 2004, which states: "This account is governed by a pre-dispute arbitration clause, which is found in paragraph 18 of the Customer Agreement. I acknowledge that I have read and understand the pre-dispute arbitration clause and agree to resolve any disputes arising out of my account by arbitration." (Doc. 34-2 at 6). Annexed to the application is a Client Agreement, entered into by the Jamieson Family Foundation and, like the account application, is dated December 13, 2004. Paragraph 17 of this agreement also contains an arbitration provision, which states in pertinent part:

> Client agrees that all controversies that may arise between the parties concerning performance or breach of this Agreement, or any other agreement between the parties, whether entered into before, on, or after the date this Account is opened shall be determined by arbitration.

(Doc. #34-2 at 14).

The above arbitration provisions express plaintiffs' agreements to arbitrate.

B.  <u>Non-Signatory Arbitration Enforcement</u>

Plaintiffs argue the arbitration provisions are not enforceable because the account applications do not reference SAA, and, as a result, Securities America cannot compel plaintiffs to arbitrate their claims.

The Court disagrees.

A party to an arbitration agreement "is estopped from avoiding arbitration with a non-signatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement" to which the estopped party has agreed. <u>Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.</u>, 271 F.3d 403, 404 (2d Cir. 2001). This

theory is fact-specific and requires "careful review of the relationship among the parties, the contracts they signed . . . and the issues that had arisen among them." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d at 177.

Here, the issues SAA seeks to resolve in arbitration are intertwined with the subjects giving rise to the instant matter—the Securities America brokerage accounts and Securities America's alleged failure to maintain proper compliance respecting same. Indeed, Securities America's obligations to plaintiffs arise from plaintiffs' account applications—which established plaintiffs' Securities America brokerage accounts—and collateral agreements. Moreover, plaintiffs' own pleading treats SAA and SAI as one and the same for purposes of liability. Accordingly, that some of the provided account applications reference SAI, but not SAA, is of no moment.

  C. <u>Relationship Between the Arbitration Provisions and the New Account Applications</u>

Plaintiffs argue Securities America has failed to demonstrate the specific arbitration provisions identified above correspond to the new account applications identified above, and, as a result, the arbitration provisions cannot be enforced.

This argument is unconvincing. Declarations of Paul Huerter, a vice president at Securities America, note the arbitration provisions referenced above are true and complete copies of the agreements incorporated by and referenced in plaintiffs' account applications. Plaintiffs challenge this averment but offer no evidence to the contrary. For these reasons, Securities America has demonstrated the agreements are enforceable.

Moreover, a plain reading of the arbitration agreements evidences the parties' agreements to arbitrate all controversies between the parties, whether such controversies arise in connection with the specific accounts that incorporate the arbitration provisions, or any other agreement

9

between the parties. Accordingly, the arbitration provisions are enforceable for this reason as well.

Plaintiffs further dispute the validity of the arbitration provisions by stating such provisions are not signed or initialed. In addition, Judith Jamieson states in a declaration she has no recollection of agreeing to the terms of the arbitration provisions.

These arguments miss the mark. As noted above, Judith Jamieson, like the other plaintiffs, did in fact execute account applications incorporating the terms of the arbitration agreements attached to Securities America's briefing. The executed account applications include express acknowledgements that plaintiffs received and understood the applicable arbitration provisions. Moreover, Judith Jamieson's contention that she does not recall agreeing to arbitrate is insufficient to invalidate the provisions. See Maricano v. DCH Auto Grp., 14 F. Supp. 3d 322, 332 (S.D.N.Y. 2014) (holding a party's "contention that she did not read the entire Arbitration Agreement, by itself, does not create a material factual dispute, because a party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms."). Accordingly, plaintiffs' arguments do little to demonstrate the arbitration provisions are inapplicable or unenforceable.

D.   Incongruent Arbitration Terms

Plaintiffs also argue the arbitration provisions should not be enforced because they contain varying terms. Specifically, plaintiffs note some of the client agreements are governed by Nebraska law, some by Massachusetts law, and that some arbitration provisions provide for arbitration with the American Arbitration Association, while others do not. For these reasons, plaintiffs argue "the question of which standard agreement applies could be consequential." (Doc. #24 at 14).

10

The Court disagrees.

As a preliminary matter, plaintiffs' argument incorrectly presupposes that plaintiffs all must have agreed to the same terms of arbitration respecting their individual Securities America brokerage accounts or subsequent agreements respecting same.

Moreover, such inconsistencies within the arbitration agreements do not implicate the essential terms of the parties' general agreements to arbitrate. See Wework Cos., Inc. v. Zoumer, 2016 WL 1337280, at *5 (S.D.N.Y. Apr. 5, 2016); see also Gerena v. Neurological Surgery, P.C., 2016 WL 3647782, at *4 n.4 (E.D.N.Y. June 9, 2016), report & recommendation adopted, 2016 WL 3647866, at *1 (E.D.N.Y. July 1, 2016) (collecting cases). Indeed, if parties to an arbitration agreement cannot agree on an arbitrator, they may request that the Court appoint one. See 9 U.S.C. § 5; Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53, 615 F. App'x 22 (2d Cir. 2015) (summary order). Accordingly, plaintiffs' argument fails to persuade.

### E. No Superseding Agreement

Plaintiffs argue an agreement executed by Robert and Judith Jamieson on November 12, 2010 (the "2010 agreement"), should be read to supersede any agreements between the parties to arbitrate.

The Court disagrees.

An obligation to arbitrate may of course be superseded and displaced by a subsequent agreement between the parties. Ruiz v. New Avon LLC, 2019 WL 4601847, at *8 (S.D.N.Y. Sept. 22, 2019) (collecting cases). "Any such provision, however, must be sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding,

11

displacing, or waiving the arbitration obligation." COR Clearing, LLC v. Jarvis, 2014 WL 98799, at *6 (D. Neb. Jan. 9, 2014).

Indeed, "[a]lthough more than one interpretation of a provision might be possible, the presumption in favor of arbitration requires a sufficiently specific forum selection clause to preclude arbitration." COR Clearing, LLC v. Jarvis, 2014 WL 98799, at *6; see also Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth., 764 F.3d 210, 215 (2d Cir. 2014) (noting "an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause," even if the forum selection clause does not specifically mention the former agreement to arbitrate).

Fatally to plaintiffs' arguments, the 2010 agreement does not contain a forum selection clause and does not evince an understanding between the parties to rescind any prior agreements to arbitrate. Indeed, the 2010 agreement's sole, general reference to any court or forum appears in a severability clause, not a specific forum selection provision:

> The parties hereto agree that if any term, provision, duty or obligation under this Agreement is held by any court to be unenforceable or illegal or in conflict with applicable law, the validity of the remaining portions of this Agreement shall not be affected and the remaining rights and obligations of the parties shall be construed and enforced as if such invalidity or unenforceable provision was not contained in this Agreement.

(Doc. #26-1 at 8) (emphasis added). This severance provision neither displaces the parties' prior agreements to arbitrate nor selects a new forum for dispute resolution.

Likewise, the 2010 agreement's merger provision, which states the 2010 agreement "represents the entire Agreement between the parties with respect to the subject matter contained herein," neither displaces the arbitration agreements nor selects a new forum. (Doc. #26-1 at 9). The 2010 agreement, titled the "Managed Opportunities Program Client Agreement," involves

Robert and Judith Jamieson's new account opening for the management of a particular initial investment of $250,000. (See id. at 2).

Accordingly, the 2010 agreement corresponds with one individual account and does not displace the parties' previous agreements to arbitrate.

III.  Scope of the Arbitration Agreements

Finally, plaintiffs' claims fall within the scope of the arbitration provisions.

A provision requiring arbitration of "all" disputes between contracting parties generally is broad in scope. See Ryan, Beck & Co. v. Fakih, 268 F. Supp. 2d 210, 221 (E.D.N.Y. 2003) (concluding an agreement requiring arbitration of "[a]ll disputes" is "sufficiently plain and sweeping"). Where a provision to arbitrate is broad, "its coverage extends to collateral matters" beyond the interpretation and particular provisions of the contract containing the arbitration clause. JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d at 172. Indeed, "[i]f the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them." Id.

Here, the scope of the parties' arbitration provisions is broad. See JLM Indus., Inc. v. Stolt-Nielson SA, 387 F.3d at 172 (collecting cases). The provisions encompass "all controversies" between plaintiffs and Securities America, including disputes that concern Securities America's performance respecting specific brokerage accounts and "any other" agreements the parties have entered into, at any time. (See Docs. ##12-4 at 2; 34-2 at 14).

Moreover, plaintiffs' central factual allegations posit that Securities America committed violations of federal and state law in connection with its oversight and maintenance of plaintiffs' brokerage accounts. Such claims, even if beyond the interpretation and particular provisions of the contracts containing the arbitration provisions, are collateral to the agreements governing

13

plaintiffs' brokerage accounts and thus are subject to the arbitration provisions at issue. See JLM Indus., Inc. v. Stolt-Nielson SA, 387 F.3d at 172.

Accordingly, plaintiffs' claims against Securities America fall within the scope of the parties' agreements to arbitrate and must therefore be arbitrated.

IV. Stay of Proceedings

In accordance with Second Circuit precedent, the Court will stay further proceedings pending arbitration. See Katz v. Cellco P'ship, 794 F.3d 341, 345 (2d Cir. 2015).

"Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d at 856. Moreover, courts stay proceedings when disposition of the arbitrable claims will inform resolution of or dispose of the non-arbitrable claims. See Syncora Guarantee Inc. v. HSBC Mex., S.A., 861 F. Supp. 2d 252, 261 (S.D.N.Y. 2012) (collecting cases).

Plaintiff's arbitrable claims predominate the case. Indeed, all eleven of plaintiffs' claims for relief implicate and are pleaded against Securities America. Although some of those claims are also pleaded against defendants May, Bell, and ECP, a stay of all proceedings pending arbitration is warranted.[3]

---

[3] The Court previously declined to stay the action as against Bell. (Doc. #52). However, the pending criminal charges against Bell further warrant a stay of plaintiff's claims against her.

**CONCLUSION**

Securities America's motion for a stay and to compel arbitration is GRANTED.

This action is STAYED pending further Order of the Court.

By March 31, 2020, and every ninety days thereafter, plaintiffs and Securities America shall inform the Court by joint letter of the status of arbitration. Additionally, within ten days of completion of arbitration, the parties shall provide a status report to the Court.

The Clerk is instructed to terminate the motion. (Doc. #10).

Dated: December 20, 2019
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge