```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ROBERT JAMIESON, JUDITH JAMIESON,            :
ROBERT JAMIESON, as Trustee for the          :
Raymond David Jamieson Irrevocable           :
Grandchildren's Trust, and JUDITH            :
JAMIESON, as Trustee for the Jamieson        :   OPINION AND ORDER
Family Foundation,                           :
                        Plaintiffs,          :   19 CV 1817 (VB)
v.                                           :
                                             :
VANIA MAY BELL,                              :
                        Defendant.           :
--------------------------------------------------------------x
```

Briccetti, J.

Plaintiffs Robert Jamieson, Judith Jamieson, Robert Jamieson as Trustee for the Raymond David Jamieson Irrevocable Grandchildren's Trust, and Judith Jamieson as Trustee for the Jamieson Family Foundation, bring this action against pro se defendant Vania May Bell, the former controller and chief compliance officer of Executive Compensation Planners, Inc. ("ECP"). Plaintiffs bring claims against defendant for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.[1] Plaintiffs seek compensatory and punitive damages.

Before the Court is plaintiffs' motion for summary judgment. (Doc. #136).

For the following reasons, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1] Although additional claims were brought against defendant in the complaint, plaintiffs only move for summary judgment on these two claims and state that any relief sought for the additional claims "would be duplicative of the relief sought by Plaintiffs' other claims" and "a grant of summary judgment in favor of Plaintiffs on aiding and abetting fraud and aiding and abetting breach of fiduciary duty will eliminate the need for a trial on the remaining claims." (Doc. #139 at 7 n.1).

1

# BACKGROUND

The parties have submitted memoranda of law and plaintiffs have submitted a statement of undisputed material facts pursuant to Local Civil Rule 56.1,[2] along with supporting declarations and exhibits. Together, these submissions reflect the following relevant background.

I.  Plaintiffs' Relationship with ECP

In 1983, Hector May organized and became the president of ECP. In 1993, defendant Bell, May's daughter, began working at ECP and eventually became the controller and chief compliance officer.

In 1999, the Jamieson family hired May as their financial advisor on the recommendation of Robert Jamieson's father. May persuaded the Jamieson family that he was acting in their best interest by pretending to be their "close friend" in addition to "financial adviser." (Doc. #138 ("Jamieson Decl.") ¶ 6). After Robert Jamieson's severe hemorrhagic stroke in or around early 2015, May assured Judith Jamieson, Robert's wife, that he was taking care of their finances, she had nothing to worry about, and she could focus on her husband's recovery.

---

[2] Defendant did not respond to plaintiffs' Rule 56.1 statement, despite being on notice of her obligation to do so. (See Doc. #143). Thus, the Court may deem the facts in the Rule 56.1 statement to be undisputed. See Local Civil Rule 56.1(c). Nonetheless, defendant is proceeding pro se, so the Court must be "satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." Jackson v. Jackson, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021). Accordingly, the Court has independently reviewed the factual record with respect to each of plaintiffs' statements of undisputed material fact.

Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

Defendant will be provided copies of all unpublished cases cited in this opinion. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

The Jamieson family instructed May to invest their funds in short-term bonds and laddered bonds with longer maturity dates. The instructions stated the proceeds of the laddered bonds should be invested in equity securities. In addition, the instructions set aside funds for $29,000 in monthly disbursements for living expenses. (Doc. #138-1 at ECF 4).[3]

In April 2004, Robert Jamieson received a substantial payment in connection with his termination of employment as Chief Executive Officer of BMG North America. The Jamieson family intended for this payment and other savings to be their principal source of income "for the rest of [their] lives," which they communicated to May. (Jamieson Decl. ¶ 9). As of 2004, the Jamieson family had $14,061,269 of their life savings invested in brokerage accounts with ECP.

II.     Scheme to Defraud

Beginning around 2001, May advised the Jamieson family to open approximately twenty different brokerage accounts throughout the course of their relationship. May then advised the Jamieson family to primarily invest in municipal bonds. May "regularly directed" the Jamieson family to withdraw money from their brokerage accounts and wire the money to an account entitled "Executive Compensation Planners, Inc. Custodial Account FBO Robert and Judith Jamieson." (Jamieson Decl. ¶ 19(b)). May told the Jamieson family the money was needed to purchase new municipal bonds on its behalf. However, there was no custodial account. Rather, the bank account was held in ECP's name, and May and defendant Bell enjoyed full access to the funds in that account.

At the end of February 2018, against May's advice, Judith Jamieson moved the Jamieson family's funds to a different brokerage. Upon completing the transfer, Jamieson learned May

---

[3] "ECF__" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

and defendant Bell "had stolen millions of dollars from [them]," and the balance remaining in the accounts was $51,313. (Jamieson Decl. ¶ 34).

III.   Defendant Bell's Involvement

During this time, defendant Bell knew wire transfers from ECP clients, including the Jamieson family, were part of May's scheme to steal client money. Defendant assisted in perpetrating the scheme by emailing the Jamieson family instructions on how and where to wire funds. In addition, defendant prepared many fake account statements that overstated the Jamieson family's account balances by millions of dollars. The fake account statements led the Jamieson family to believe its investments were safe. Defendant also tracked the stolen money by falsely recording the payments as loans, knowing that the amounts totaled were too high for May to pay back.

IV.   Related Criminal Proceedings

May and defendant Bell both pleaded guilty to federal criminal charges brought against them based on this scheme.

A.   Hector May

May pleaded guilty to conspiracy to commit wire fraud and investment advisor fraud. (See Doc. #137-1 ("May Guilty Plea")). In the felony information to which May pleaded guilty, the Jamieson family was identified as "Victim-1." (Jamieson Decl. ¶ 41). At his guilty plea, May testified he "provided financial advisory services to approximately 130 clients" and "handled all of the clients' files for those accounts, managed ECP's clients' monies, executed the securities trades, produced account statements reflecting their account activities and forwarded these account statements to the ECP clients." (May Guilty Plea at 27). May also admitted he "perpetrate[d] a scheme to defraud approximately 14 ECP clients by inducing them to turn over

4

approximately [$11.5 million] to myself or my company . . . under the false pretense that I was going to use the money to purchase bonds or other investments, on their behalf." (Id.).

B.      Defendant Bell

Defendant Bell pleaded guilty to conspiracy to commit wire fraud.  As part of the plea agreement, defendant admitted to a forfeiture allegation and agreed to forfeit $589,942 to the United States, which represents the proceeds traceable to the commission of the offense.  (Doc. #137-2 ("Bell Guilty Plea") at 15).  In addition, defendant agreed to make restitution in the amount of $8,041,233, which was to be joint and several with the restitution ordered in May's criminal proceeding.

At her plea hearing, defendant admitted under oath:

Around 2010, around the time my husband died, I learned that the money from some clients was no longer being invested at Securities America and that it was being deposited into a custodial account at ECP, my father's company.  I asked my dad about the large number of deposits into the custodial account at ECP, I asked my dad about the large number of deposits, and he told me he was using the money to make payroll and fund his lifestyle.

Initially, my dad said that he planned to pay this money back.  I trusted my father would pay it back, but I later realized that the amount of money was so large that he would never be able to pay it back.  I helped my dad facilitate this fraud by emailing the [clients] paperwork which enabled them to withdraw money from Securities America so that he could send the money—so that they could send the money, the victims, to the ECP custodial account.

I also helped assisting with ECP's bookkeeping.  I handled the data entry which tracked expenses and income coming into ECP's operating accounts.  While doing this, I noticed most of the time that the large amounts of money was being electronically transferred by my father from custodial accounts into operating accounts.  My dad told me to label these transfers as loans payable in ECP's books.  I knew at the time that these were not loans, but I nonetheless labeled them as loans in the ECP books.

I also helped my dad by typing up fabricated statements that my father would draft by hand.  My dad would hand write the statements on paper, and I would type them up so that they would look professional.  I was aware these false statements were being sent to clients so that they would think their investments were safe.  These statements were then sent to the client.

(Bell Guilty Plea at 28–29).

Defendant also admitted the fraud continued until March 8, 2018, when federal investigators seized the ECP office. She admitted she committed these acts knowingly and willingly, knew her conduct was unlawful, and acted with a specific intent to defraud. She also stated she signed the plea agreement freely and voluntarily and no one coerced her into pleading guilty at the hearing.

V.   Default Judgement Against May and ECP

On August 30, 2021, in this action, the Court entered default judgment against co-defendants May and ECP as to liability on all claims, including breach of fiduciary duty. (Doc. #84). On an inquest for calculation of damages, Magistrate Judge Judith C. McCarthy recommended an award of: (i) $20,566,010 in compensatory damages for the period from 2001 through February 2018, representing the difference between what the Jamieson family's investments should have been worth as of February 2018 and the $51,313 remaining in their accounts as of that date; and (ii) an equal amount in punitive damages. (Docs. ##98, 104).

On May 2, 2022, the Court adopted Judge McCarthy's Report and Recommendation. (Doc. #106). Default judgment was entered against May and ECP for $31,632,020, which reflected $20,566,010 in compensatory damages, $20,566,010 in punitive damages, and a reduction of $9,500,000 in payments plaintiffs received from other defendants for related claims in this case. (Doc. #105).

## DISCUSSION

I.   Standard of Review

   A.   Summary Judgment

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Id.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).

It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown ex rel. Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "The mere existence of a scintilla of evidence in support" of the non-moving party's position is likewise insufficient; "there must be evidence on which the jury could reasonably find for" the non-moving party. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736,746 (2d Cir. 1998). The burden to proffer evidence admissible pursuant to the Federal Rules of Evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at *4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)). Bald assertions, unsupported by admissible evidence, are thus not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

Although courts must afford pro se litigants special solicitude on a motion for summary judgment and read their submissions "to raise the strongest arguments that they suggest," such solicitude "does not relieve [a] plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Recs., 351 F.3d 46, 50 (2d Cir. 2003).

B.   Collateral Estoppel

The doctrine of collateral estoppel—also known as issue preclusion—bars successive litigation of an issue of fact or law actually litigated and resolved in a prior judgment, even if the issue recurs in the context of a different claim. Taylor v. Sturgell, 553 U.S. 880, 892 (2008). The doctrine applies when: "(1) the identical issue was raised in a previous proceeding; (2) the

issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288–89 (2d Cir. 2002).  "[A]n issue is decisive in the present action if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint." Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003).

"It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978); see also SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 326 (S.D.N.Y. 2007) ("[Defendant] was convicted by guilty plea on securities-fraud charges related to the same activities at issue here.  Thus, all questions of fact material to and underlying [defendant's] criminal conviction, as established during the plea allocution, bind [defendant] in this subsequent civil action.").  And "[b]ecause mutuality of obligation is no longer an absolute requirement under federal law, a party other than the Government may assert collateral estoppel based on a criminal conviction." Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986).  As such, criminal defendants are barred from relitigating in a civil proceeding any issues determined adversely to them in their criminal proceeding.[4]  See id.

---

[4]     Pursuant to Rule 803(22) of the Federal Rules of Evidence, evidence of a final judgment entered upon a guilty plea is admissible to prove any fact essential to the final judgment in a collateral civil action.  See Picard v. Rar Entrepreneurial Fund, Ltd., 2021 WL 827195, at *7 (S.D.N.Y. Mar. 3, 2021) (collecting cases).

II.   Aiding and Abetting Fraud Claim

Plaintiffs argue defendant's guilty plea to conspiracy to commit wire fraud collaterally estops her from challenging liability on their aiding and abetting fraud claim.

The Court agrees.

To prevail on a claim for aiding and abetting fraud, a plaintiff must show: "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006). In the context of an aiding and abetting fraud claim, substantial assistance "exists where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018). Substantial assistance may include executing transactions or providing false information to present an "enhanced financial picture to others." See Primavera Familenstifung v. Askin, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001).

Here, defendant's guilty plea to conspiracy to commit wire fraud establishes each element of an aiding and abetting fraud claim. Defendant admitted "there [was] a scheme or artifice to defraud others of money or property by means of false or fraudulent pretenses, representations, or promises." (Bell Guilty Plea at 25). Defendant also admitted she "knowingly and willingly devised or participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud." (Id.). Specifically, in her own words and under oath, defendant explained: (i) through her role as controller and chief compliance officer of ECP, she materially misrepresented plaintiffs' need to withdraw their money from brokerage accounts and send it to the "ECP custodial account" so new municipal bonds could be purchased on plaintiffs' behalf (id. at 28–29); (ii) she knew May was using the funds in the custodial

10

account to "make payroll and fund his lifestyle," rather than buying municipal bonds (id. at 28); and (iii) she concealed the fraud by labeling "these transfers as loan payables in ECP's books" and "typing up fabricated statements" to be sent to plaintiffs so "they would think their investments were safe" (id. at 29).

In opposition to the motion, defendant argues plaintiffs are not listed as victims in an order of restitution in her criminal case, and therefore the statements made in her guilty plea are inapplicable to plaintiffs' claims. (Doc. #152 at ECF 10). However, as defendant acknowledged in a letter to the court in her criminal case, plaintiffs were previously listed as victims, but were subsequently replaced by Securities America, Inc., after plaintiffs recovered a settlement from that entity. United States v. Bell, 19-cr-550 (NSR) (S.D.N.Y. Jan. 10, 2024), Doc. #92; see also id., Doc. #93 at ECF 2 (government explaining that at the time of defendant's sentencing, it "did not have complete information as to whether and how much certain victims had obtained in recoveries from insurance or other sources in connection with their losses"). In addition, it is undisputed that in May's criminal case the Jamieson family was identified as "Victim-1." (Jamieson Decl. ¶ 41).

Accordingly, all three elements of plaintiffs' aiding and abetting fraud claim were fully and fairly litigated against defendant in her criminal proceeding. Defendant is thus collaterally estopped from challenging liability on this claim, and plaintiffs are entitled to judgment as a matter of law.

III.   Aiding and Abetting Breach of Fiduciary Duty Claim

Plaintiffs argue defendant's guilty plea to conspiracy to commit wire fraud also collaterally estops her from challenging liability on their aiding and abetting breach of fiduciary duty claim.

The Court agrees.

To prevail on a claim for aiding and abetting breach of fiduciary duty, a plaintiff must show: "(1) a breach by a fiduciary of obligations to another, (2) the defendant's knowing inducement of or participation in the breach, and (3) damages suffered by the plaintiff from the breach." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 134 (2d Cir. 2008).

First, it is undisputed that May breached his fiduciary obligations to the Jamieson family. As their investment advisor, May owed a fiduciary duty to plaintiffs. See I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC, 280 F. Supp. 3d 524, 542 (S.D.N.Y. 2017) ("Investment advisors owe a fiduciary duty to the clients they advise."). And, in his criminal proceeding, May pleaded guilty to investment adviser fraud. (May Guilty Plea at 26). In addition, the Court entered default judgment in this case against May as to the claims plaintiffs brought against him, which included a claim for breach of fiduciary duty.

Second, defendant Bell knowingly participated in May's breach of fiduciary duty. She provided substantial assistance to May by sending plaintiffs instructions on how and where to wire funds so that May could transfer them to the ECP custodial account, creating fake account statements to send to plaintiffs to conceal the fraudulent activity, and tracking the stolen money by falsely recording the transfers as loans. See S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 850 (2d Cir. 1987) (finding defendant knowingly participated in the breach of duty by sending misleading letters to the plaintiff at the fiduciary's request). Contrary to defendant's contentions, plaintiff need only show that defendant "provide[d] substantial assistance to the primary violator," not that defendant herself had a fiduciary duty to plaintiffs. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006).

Finally, it is undisputed that plaintiffs suffered damages as a result of the breach. When defendant pleaded guilty to conspiracy to commit wire fraud, she agreed to make restitution in the amount of $8,041,233, which was to be joint and several with the restitution ordered in May's criminal proceeding. Moreover, the damages inquest and subsequent default judgment entered against May in this case demonstrate plaintiffs suffered compensatory damages of $20,566,010 as a result of May's breach of fiduciary duty.

Accordingly, all three elements of plaintiffs' aiding and abetting breach of fiduciary duty claim were fully and fairly litigated against defendant in her criminal proceeding. Defendant is thus collaterally estopped from challenging liability on this claim, and plaintiffs are entitled to judgment as a matter of law.

IV. Damages

Plaintiffs argue defendant Bell is jointly and severally liable with May and ECP for compensatory damages in the amount of $20,566,010, minus $9,500,000 as recovered from other defendants in this case, and individually liable for $20,566,010 in punitive damages.

The Court agrees.

A. Legal Standard

"Under New York law, where defendants acted jointly and/or concurrently to produce a single injury, those defendants must be held jointly and severally liable for all of the harm resulting from their actions." Howard v. Freedman, 2016 WL 5417884, at *8 (S.D.N.Y. July 21, 2016). In addition, recognition of an aiding and abetting fiduciary duty claim is accompanied by the longstanding principle of New York courts that "anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of damage caused thereby." S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 848 (2d Cir. 1987). When a plaintiff settles with one of

several joint tortfeasors, New York law provides that the plaintiff's claim against the remaining tortfeasors must be reduced by the amount paid in the settlement. Howard v. Freedman, 2016 WL 5417884, at *8.

Although defendant may be held jointly and severally liable for compensatory damages, punitive damages must be determined on an individual basis. See Rodick v. City of Schenectady, 1 F.3d 1341, 1349 (2d Cir. 1993). To state a claim for punitive damages, a plaintiff "must allege conduct which is aimed at the public generally, involves a fraud evincing a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations." Manning v. Utils. Mut. Ins. Co., Inc., 254 F.3d 387, 400 (2d Cir. 2001). "Under New York law, punitive damages are allowable in tort cases involving claims for fraud [or] breach of fiduciary duty . . . even if there is no harm aimed at the general public so long as the very high threshold of moral culpability is satisfied." Blank v. Baronowski, 959 F. Supp. 172, 179 (S.D.N.Y. 1997). "The conduct for which courts generally award punitive damages is that which is close to criminality, being variously described as utter recklessness, reckless and of a criminal nature, wanton or malicious, and gross and outrageous." Koch v. Greenberg, 14 F. Supp. 3d 247, 273 (S.D.N.Y. 2014).

In determining the amount of punitive damages, courts consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003). Although there is no prescribed upper limit on the ratio of punitive damages to compensatory damages, when the compensatory damages award is large, a smaller ratio, "perhaps only equal to

compensatory damages," is appropriate.  Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 149 (2d Cir. 2015).

      B.     <u>Analysis</u>

Here, it is undisputed that defendant Bell acted jointly and concurrently with May to cause a financial loss to plaintiffs.  In addition, defendant Bell knowingly participated in May's breach of plaintiffs' trust.  Thus, defendant must be held jointly and severally liable for plaintiffs' compensatory damages in the amount of $20,566,010.  Pursuant to New York law, this amount must be offset by the $9,500,000 paid by defendants Securities America, Inc., and Securities America Advisors, Inc., to plaintiffs in settlement of their claims.  (Doc. #98 at 3).

Defendant's conduct is also subject to punitive damages.  The conduct was not merely close to criminality but was in fact criminal.  Defendant's actions were highly reprehensible, involving fraud and deceit over many years with full knowledge that her actions were unlawful.  Although the compensatory damages plaintiffs seek are substantial, a one-to-one ratio of compensatory to punitive damages is appropriate here.  See Johnson v. Nextel Commc'ns Inc., 780 F.3d at 149.  Moreover, an award of punitive damages equal to the $20,566,010 in compensatory damages is consistent with damages awarded in similar cases.  See, e.g., Cont'l Indus. Grp., Inc. v. Altunkilic, 2020 WL 3884312, at *8 (S.D.N.Y July 1, 2020) (recommending award of $10,459,870.55 in punitive damages equal to compensatory damages for breach of fiduciary duty claim).

Accordingly, defendant is jointly and severally liable with May and ECP for compensatory damages in the amount of $20,566,010, minus the $9,500,000 recovered from other defendants, and individually liable for $20,566,010 in punitive damages, for a total amount of $31,632,020.

## CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED.

The Court directs the Clerk to enter a judgment that states:

1. Plaintiffs are entitled to judgment against defendant Vania May Bell on plaintiffs' aiding and abetting fraud and aiding and abetting breach of fiduciary duty claims;

2. Defendant Vania May Bell is liable to plaintiffs in the total amount of $31,632,020. Of this amount, defendant Bell is jointly and severally liable with Hector May and Executive Compensation Planners, Inc., for compensatory damages in the amount of $11,066,010 (i.e., $20,566,010 less $9,500,000 recovered by plaintiffs from other defendants in this case), and is individually liable for $20,566,010 in punitive damages.

The Clerk is instructed to terminate the motion (Doc. #136) and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

Chambers will mail a copy of this Opinion and Order and all unpublished decisions cited herein to defendant Bell at the address on the docket.

Dated:  October 15, 2024
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge